**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| INTERNATIONAL UNION OF<br>OPERATING ENGINEERS, LOCAL 150,<br>AFL-CIO,<br><br>Plaintiff,<br><br>v.<br><br>GROSSHENING, INC. d/b/a<br>GROSSHENING INDUSTRIAL SERVICE<br>COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  20 C 389<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court are Plaintiff International Union of Operating Engineers, Local 150, AFL-CIO's ("Local 150") and Defendant Grosshening, Inc.'s ("Grosshening") Cross-Motions for Summary Judgment under Federal Rule of Civil Procedure 56. For the following reasons, the Court grants-in-part and denies-in-part both Motions.

## BACKGROUND

The following facts are taken from the record and are undisputed unless otherwise noted.

### a. Background Facts

Local 150 is a construction trade union representing heavy equipment operators in building and road construction throughout northern Illinois. Grosshening is a

construction company located in Joliet, Illinois, which specializes in building demolition, concrete removal, construction site preparation and grading, site remediation, and debris removal. Grosshening is solely owned and operated by Gregory Kulbartz.

On January 1, 2001, Local 150 and Grosshening signed a Memorandum of Agreement (the "MOA") that adopted the terms of a master collective bargaining agreement negotiated between Local 150 and the Mid-America Regional Bargaining Association ("MARBA"), commonly referred to as the Heavy Highway & Underground Agreement (the "CBA"). The MOA stated:

> This Agreement and the adoption of the Master Agreement . . . shall be effective as of January 1, 2001, and remain in effect to and including the expiration date of the Master Agreement adopted herein. This Agreement shall continue in effect from year to year thereafter and specifically adopt any Master Agreement entered into between the Union and M.A.R.B.A. Heavy & Highway & Underground Agreement subsequent to the expiration date of the Master Agreement herein adopted unless notice of termination or amendment is given in the manner provided herein.

Dkt. # 60-1, p. 8. The term of the CBA then in effect was June 1, 1995 to May 31, 2001. Subsequent CBAs were in effect from: June 2001 through May 2007; June 2007 through May 2010; June 2010 through May 2013, extended through May 2017; and June 2017 through May 2021.

To amend or terminate the MOA, a party must notify the other in writing at least three months prior to the termination of the CBA. On November 13, 2012, Kulbartz sent a letter to Local 150 stating:

2

> Our records show that we have not employed any members of your union during the term of our current agreement which expires June 2013. We are therefore notifying you of our intent to terminate the agreement effective immediately, but no later than its expiration date, and not to [be] included in any successor agreement.

Dkt. # 60-1, p. 10. On December 5, 2012, Dale Pierson, Local 150's General Counsel,

responded:

> It is my understanding that Grosshening, Inc. and Local 150 are parties to the Mid-America Regional Bargaining Association Heavy, Highway & Underground Agreement which expire[s] May 31, 2013. The Company is requested to honor the terms of the Agreement through its expiration date regardless of whether it employs Union members. Thereafter, the Employer is required by federal law to negotiate a successor agreement.

*Id.* at p. 15. No negotiations took place and a successor agreement was never executed.

**b.     The Arbitration Awards**

Under the CBA, the parties were required to resolve disputes before a Joint

Grievance Committee ("JGC"). The JGC is made up of an equal number of MARBA

representatives and Union representatives. The JGC's decision, if by majority vote, is

binding on the parties. But if the JGC is unable to resolve a dispute by majority vote,

the grievance may be submitted to a neutral arbitrator.

At issue in this case are five arbitration awards. The first two grievances were

heard in March and July 2016, respectively. The JGC found in favor of Local 150 in

each dispute. Grosshening did not participate in either hearing, but received notice of

each of the JGC's decisions.

3

The third grievance was heard in November 2019. This time Kulbartz appeared with counsel. He presented evidence that Grosshening was not a party to the CBA, it terminated the MOA in November 2012, it did not employ any Local 150 members, and it had no intent to employ Local 150 members in the future. Nevertheless, the JGC ruled in favor of Local 150.

The final two awards were issued in August 2020, while Grosshening's motion to dismiss Local 150's complaint in this action was pending. Grosshening again did not participate in the hearings related to these awards. In November 2020, Grosshening filed a petition to vacate these two awards in this Court.

Based on these events, Local 150 filed a five-count complaint seeking enforcement of the five arbitration awards under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Grosshening brings a two-count counterclaim seeking to vacate all five arbitration awards under the LMRA and for a declaratory judgment that it is not bound to the CBA. Both parties now move for summary judgment under Rule 56.

## **LEGAL STANDARD**

For cross-motions for summary judgment, the Court must "look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact." *Santanella v. Metro Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). Our factual and

4

inferential construction is unaltered by the procedural nuance of cross-filings, for each party retains their "respective burdens on cross-motions for summary judgment." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed. Appx. 92, 95 (7th Cir. 2012).

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc*., 629 F.3d 697, 704–05 (7th Cir. 2011).

## DISCUSSION

The Motions raise two primary issues. First, whether Grosshening is time-barred from challenging the arbitration awards. Second, whether Grosshening terminated the MOA. We address each in turn.

## I.    90-Day Time-Bar

Local 150 first asserts Grosshening did not challenge the arbitration awards within 90 days and is therefore now time-barred from challenging them.  *See Sullivan v. Gilchrist*, 87 F.3d 867, 871 (7th Cir. 1996); *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Rabine*, 161 F.3d 427, 431 (7th Cir. 1998).

In *Rabine*, the defendant company argued it was not bound by an arbitrator's decision because there was not a valid CBA.  161 F.3d at 431.  Relying on *Sullivan*, the Seventh Circuit held the company waived the argument because it did not challenge the arbitration award within 90 days.  *Id.* (citing *Sullivan*, 87 F.3d at 871).  "[W]hen a defendant 'fails to articulate a reason why it needed more than the ninety days,' . . . a federal court will ignore the defense and enforce the judgment of the arbitrator."  *Id.* (quoting *Loc. 802, Associated Musicians of Greater N. Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998)).  While the court found it "difficult to see how an arbitrator could have concluded that the contract between [the company] and Local 150 was a valid CBA under the LMRA," because the company and its owner "made the decision to sit on their collective hands, they waived the right to challenge the outcome later."  *Id.*  The Seventh Circuit concluded with a prescient warning: not challenging an arbitration award within 90 days is "a high-stakes gamble, and it is not one that this court commends to future defendants in arbitration disputes, since if there is an exception to the 90-day limitations period we have not encountered it in the past and

we do not create one today. The rule is a simple one: If you receive notice of an adverse decision in a federal labor arbitration, challenge it within 90 days or expect to pay up." *Id.* at 433–34.

Grosshening, relying on *International Union of Operating Engineers, Local 150, AFL-CIO v. Triad Construction Services, Inc.*, 1999 WL 759516 (N.D. Ill. 1999), argues the 90-day bar does not apply where a party contests the validity of the contract. But Grosshening's reliance on *Triad* is misplaced. *Triad* involved a situation where there was never a binding collective bargaining agreement at all. *Id.* at *2. The company was purportedly bound to the collective bargaining agreement by a person who had neither actual nor apparent authority to bind the company—and the union knew that. *Id.* In other words, the union acted in bad faith bringing grievances against a company it knew was not bound by a collective bargaining agreement. Therefore, the court found the company could not be bound by the 90-day limitations period. *Id.* at 3.

Here, however, Grosshening was at one point a party to the CBA, but it believed it repudiated the MOA that bound it to the CBA. Similarly, Local 150 believed Grosshening was under an obligation to continue to be bound by successor CBAs or negotiate a new agreement. There is no evidence to support an inference that Local 150 knowingly brought the grievances in bad faith, it was just wrong to believe Grosshening was bound by the CBA.

7

Moreover, *Triad* is seemingly at odds with Seventh Circuit precedent and has been rejected by every court in this District to subsequently consider it. *See Ill. Dist. Council No. 1 of Int'l Union of Bricklayers and Allied Craftworkers, AFL-CIO v. Nagel*, 2005 WL 1651814, at *2 (N.D. Ill. 2005) (Gettleman, J.); *Ill. Dist. Council No. 1 of Int'l Union of Bricklayers and Allied Craftworkers, AFL-CIO v. Gianakas*, 2005 WL 1705803, at *4 (N.D. Ill. 2005) (Pallmeyer, J.); *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Ryan & Assocs., Inc.*, 2020 WL 6287406, at *4 (N.D. Ill. 2020) (Kendall, J.). Most recently, Judge Kendall noted *Triad* is "an extreme outlier opinion" and she followed "the long line of precedent" requiring all challenges to arbitration awards to be made within 90 days of the award. *Ryan*, 2020 WL 6287406, at *4 (citing *Rabine*, 161 F.3d at 434). We do the same. The Seventh Circuit noted in *Rabine* that it had not encountered an exception to the 90-day rule, and it still has not identified one. The circumstances in *Rabine* are quite similar to those here, and we therefore follow it.

One final note. Local 150 seemingly argues Grosshening cannot challenge any of the five awards. However, Grosshening only failed to timely challenge the first three awards. It is thus barred from challenging the first three awards. But it is not time-barred from challenging the final two awards. We therefore now turn to whether Grosshening terminated the MOA or is bound by the final two awards.

8

## II.     Termination of the MOA

Grosshening asserts it repudiated the contract in November 2012 under the "one-man unit rule."  Under Section 8(f) of the National Labor Relations Act ("NLRA"), an employer in the construction industry may enter into a "pre-hire agreement" with a labor union before the employer hires any covered employees, rather than wait for a majority of employees to elect a union to represent them.  29 U.S.C. § 158(f).  "[G]enerally, a signatory to a [Section] 8(f) pre-hire agreement is bound to its terms for the duration of the agreement unless the employees covered by that agreement reject the signatory union in a [National Labor Relations] Board conducted election."  *J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers, Loc. Union 1, AFL-CIO*, 398 F.3d 967, 973 (7th Cir. 2005).  However, an employer may repudiate a pre-hire agreement if it employs one or fewer members of the union (or workers performing CBA-covered work), so long as the "one-man unit" is stable and not caused by staffing fluctuations. *Id.* at 973–74; *Weis Builders, Inc. v. Int'l Union of Operating Eng'rs*, 2017 WL 497767, at *3 (N.D. Ill. 2017).

Local 150 contests Grosshening's repudiation on two grounds.  First, it argues the MOA is an agreement under LMRA Section 9(a), 29 U.S.C. § 159(a), not a pre-hire agreement under LMRA Section 8(f), so Grosshening could not unilaterally repudiate the contract and was under an obligation to negotiate a new contract.  *Cf. Trs. of the Chi. Painters & Decorators Pension Fund v. John Kny Painting & Decorating, Inc.*,

9

188 F. Supp. 3d 760, 769 (N.D. Ill. 2016) ("Once a union achieves section 9(a) status and negotiates terms of employment for the company's employees, the company is required to recognize the union's status as the employees' representative until the union no longer enjoys the support of a majority of the company's employees. This is true even after the CBA expires."). Second, Local 150 says Grosshening employs more than one covered employee and therefore cannot rely on the "one-man unit" rule. We address each in turn.

### a. Section 8(f) or Section 9(a) Relationship

In support of its argument that the MOA is a Section 9(a) contract, Local 150 relies on the language of the MOA:

> The EMPLOYER recognizes the UNION as the sole and exclusive bargaining representative for and on behalf of the employees of the EMPLOYER within the territorial and occupational jurisdiction of the UNION. Prior to recognition, the EMPLOYER was presented and reviewed valid written evidence of the UNION's exclusive designation as bargaining representative by the majority of appropriate bargaining unit employees of the EMPLOYER.

Dkt. # 46-3, p. 2. Because of this language, Local 150 says the MOA is a Section 9(a) agreement under the National Labor Relations Board's ("NLRB") decision in *Staunton Fuel & Material, Inc.*, 335 NLRB 717 (2001). There, the NLRB held a construction industry union could prove a Section 9(a) contract based on the contract's language alone, if the language shows: "(1) the union requested recognition as the majority or 9(a) representative of the unit employees; (2) the employer recognized the union as the

majority or 9(a) bargaining representative; and (3) the employer's recognition was based on the union's having shown, or having offered to show, evidence of its majority support." *Id.* at 919–20.

However, the NLRB's holding in *Staunton Fuel* has been repeatedly rejected. In *Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 536–37 (D.C. Cir. 2003), the District of Columbia Circuit found "[t]he proposition that contract language standing alone can establish the existence of a section 9(a) relationship runs roughshod over the principles established in [*International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731 (1961)] for it completely fails to account for employee rights under sections 7 and 8(f)." The court reasoned:

> Section 8(f) represents a real benefit to both employers and unions in the construction industry, allowing them to establish bargaining relationships without regard to a union's majority status. But the [NLRB] cannot, as it did here and in [*Staunton Fuel*,] allow this relatively easy-to-establish option to be converted into a section 9(a) agreement that lacks support of a majority of employees. Otherwise the [NLRB] would be giving employers and unions "the power to completely frustrate employee realization of the premise of the Act—that its prohibitions will go far to assure freedom of choice and majority rule in employee selection of representatives."

*Id.* at 537 (quoting *Garment Workers*, 366 U.S. at 738–39). Therefore, the court found, based on the contract's language alone, a Section 9(a) relationship was not established. *Id.* at 537.

In *Colorado Fire Sprinkler, Inc. v. NLRB*, 891 F.3d 1031 (D.C. Cir. 2018), the District of Columbia Circuit again found a Section 9(a) relationship could not be

established by contractual language alone. While contractual language is relevant, there instead must also be actual evidence of employee support to overcome the presumption of a Section 8(f) relationship. *Id.* at 1039–40. Because the plaintiff had no employees at the time the contract was executed, the court found the language relied on by the NLRB was "objectively false." *Id.* at 1040. Therefore, the court concluded the NLRB's decision was "arbitrary and capricious" because "making demonstrably untrustworthy contractual language the be-all and end-all of Section 9(a) status, the Board adopted a rule of law that would leave in potentially 'careless employer and union hands the power to completely frustrate employee realization of freedom of choice and majority rule in employee selection of representatives.'" *Id.* at 1041 (quoting *Garment Workers*, 366 U.S. at 738–39) (cleaned up).

Most crucially, the NLRB itself effectively overruled *Staunton Fuel* "[i]n the interest of restoring protection of employee free choice in the construction industry." Representation—Case Procedures: Election Bars; Proof of Majority Support in Construction-Industry Collective-Bargaining Relationships, 85 Fed. Reg. 18366-01. In support the NLRB stated:

> (1) as the D.C. Circuit recognized, Staunton Fuel permits an employer and union to "paper over" the presumption that construction-industry relationships are governed by Section 8(f); (2) under Staunton Fuel, the contract bar would prevent employees and rival unions from filing a Board election petition to challenge the union's representative status for the duration of the contract up to 3 years, even though there was never any extrinsic proof that a majority of employees supported the union; (3) the "conversion" permitted under Staunton Fuel is similar to the flawed

12

"conversion doctrine" that the Deklewa Board repudiated; and (4) the D.C. Circuit raised a legitimate concern that Staunton Fuel conflicts with statutory majoritarian principles and represents an impermissible restriction on employee free choice, particularly in light of the protections intended by Section 8(f)'s second proviso.

*Id.* Therefore, federal regulations are now clear that "[c]ollective-bargaining agreement language, standing alone, will not be sufficient to provide the showing of majority support." 29 C.F.R. § 103.22(a).

Here, we reject Local 150's argument that the MOA language alone shows it is a Section 9(a) agreement. As explained by the D.C. Circuit, such an argument is inconsistent with Supreme Court precedent and the purposes of the NLRA. Because there is no evidence[1] Grosshening employed any covered employees at the time the MOA was executed, the contract is a pre-hire agreement under Section 8(f). As such, Grosshening was permitted to unilaterally terminate the MOA if the "one-man unit" rule applies.

**b.    One-Man Unit Rule**

Local 150 says Grosshening cannot rely on the "one-man unit" rule because it employs more than one covered employee. In support, several Local 150 employees visited Grosshening work sites in 2019 and 2020 and took photographs. Local 150 says the photographs show Grosshening employees performing work covered by the CBA.

---

[1] Local 150 failed to respond to Grosshening's assertion that it did not employ any covered employees when the MOA was executed in its Statement of Facts, thereby admitting it. *See* Dkt. # 78, ¶ 26; *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (failing to respond to a statement of material fact results in the fact being admitted).

13

Kulbartz maintains he is the only person to operate machinery and perform work that is covered by the CBA. He says the photographs show only him operating machinery and the other people in the photographs include friends, neighbors, "laborers" from the Laborers' Union who are employees of a subcontractor, and a local newspaper reporter.

Local 150's arguments fail for several reasons. The photographs in no way show that anyone other than Kulbartz performing work was a Grosshening employee. Local 150 has not put forth any evidence contradicting Kulbartz's assertion that the "laborers" were employed by subcontractors and did not perform any CBA covered work. Moreover, the photographs focus on 2019 and 2020. They do not prove Grosshening employed anyone performing CBA covered work in the years directly before or after repudiating the MOA. Simply put, there is no evidence Grosshening employed anyone performing CBA covered work since 2010. *See Weis Builders*, 2017 WL 497767, at *6 (finding construction company repudiated contract with Local 150 where it was "undisputed that Weis had not directly hired any operating engineers in more than eight years, and there is no evidence to contradict its assertion that it had no plans to do so in 2008 or thereafter").

The cases cited by Local 150 for the proposition that Grosshening has unclean hands because it "manipulated" its bargaining unit size to undermine the union are inapposite. Indeed, Local 150 cited the same cases before Judge Alonso in *Weis Builders* where he observed: "Many of these cases involve employers who packed the

14

bargaining unit with employees friendly to management in the run-up to a union election, with the intent to manipulate the size and composition of the bargaining unit so that the election would have the employer's desired result." *Id* at \*5 (citing *NLRB v. Regency Grande Nursing & Rehab. Ctr.*, 462 Fed. Appx. 183, 185–88 (3d Cir. 2012); *NLRB v. Apex Paper Box Co.*, 1992 WL 229294, at \*5–6 (6th Cir. 1992) (Kennedy, J., concurring) (unpublished table decision); *Golden Fan Inn*, 281 NLRB 226, 238 (1986); *Medline Indus., Inc.*, 233 NLRB 627, 652–53 (1977)). "But in this case, unlike in the above cases, the evidence does not support any inference that [Grosshening] acted in bad faith to undermine its employees' collective bargaining representative, or that it had any serious anti-union animus . . . . Local 150 has not demonstrated that [Grosshening] avoided hiring Local 150 operators in order to manipulate the size of its work force as part of a plan to repudiate the [MOA] in bad faith." *Id.*

At bottom, the undisputed evidence shows Grosshening did not employ more than one person performing CBA covered work at the time it repudiated the CBA, it did not manipulate the size of the collective bargaining unit to reach that condition, and the condition was stable and for a long duration—two years before repudiation and at least six years after. Therefore, Grosshening was entitled to repudiate the contract using the one-man unit rule, and it did so when it communicated to Local 150 that it was terminating the MOA.

15

## CONCLUSION

For the reasons mentioned above, the Court grants-in-part Local 150's Motion for Summary Judgment (Dkt. # 57).  Grosshening is time-barred from challenging the first three arbitration awards.  Local 150's Motion is denied in all other respects.  The Court also grants-in-part Grosshening's Motion for Summary Judgment (Dkt. # 55).  Grosshening repudiated the Memorandum of Understanding in 2012, is not bound by any Collective Bargaining Agreement after May 2013, and is not bound by the final two arbitration awards.  Grosshening's Motion is denied in all other respects.  Civil case terminated.  It is so ordered.

Dated: 05/17/22

Charles P. Kocoras
United States District Judge